Good morning, Your Honors. May it please the Court, Gail Ivins, appearing on behalf of Appellant Berthe Rhodes. I wanted to start this morning with the language of the statute, 18 U.S.C. 1958a, because I think that's where we begin and end in this case. Whoever uses any facility of interstate commerce with intent that a murder be committed as consideration for the receipt of money, something of punitive value. And so the question here is, was the judge wrong when he modified this court's model instruction to add that it did not matter when the use of interstate commerce occurred? And I think clearly he was wrong, and the jury instruction that was given was wrong. This court's model instruction actually specifically refers to Driggers, the 2009 case that's referenced in the opening brief, where this court specifically discussed, although it didn't hang its hat on all of this. And what was wrong about him as to the time assignments? The timing, what's wrong as to it? Yes. If you're going to use a facility of interstate commerce with intent, then it needs to happen in the same time frame. You can't- By the same time frame, do you mean before the killing or after the killing? The killing is actually not the important thing, right, because this statute is not a murder statute, right? So what Matt- Murder, it's a murder for hire. Yes, but it doesn't matter if there's ever any physical injury to the proposed victim. It doesn't matter what happens. What matters is you use the facility of interstate commerce and you have that intent. Yes? Hold on for a second. I'm not hearing the judges very well. I can hear you well, but I'm not hearing the judges well with their asking. Can you hear me now? How about now? Yes, that's better. My question to you, Ms. Ivins, is that you say that the judge got the timing wrong. Tell me what you think the correct timing was and tell me what you think the judge got wrong as to the timing. When the judge added the language, additional language that's not in this court's model instruction, that it does not matter when the interstate commerce facility was used, he opened up this huge possibility for the government to argue that all of those wire transfers that took place the year after the murder were uses of interstate commerce and somehow that if the intent happened before the murder, those can count as some kind of jurisdictional hook, but this is an element. This is not a jurisdictional hook, and so I think we have to very carefully look at the statute. Don't you think that the evidence shows that there was an intent to commit a murder for hire before the incident took place? On whose behalf? So clearly Etienne, Robinson, and Marshall intended to commit a murder, right? I mean, we're clear that the evidence all over the place that they intended to commit a murder, and Marshall testified that not on the telephone, right? In person, there was a discussion that he recited to the jury where my client said, okay, fine, I'll do it for $5,000. That's an in-person discussion, and if that's all that happened, there is no federal murder for hire. There may be all sorts of state problems with that, but what is critical for this to be a federal crime is that the discussion happen on the telephone, on a cell phone. Wait a second, though. Are you suggesting, though, when they rely here on the wire transfers that if that's what they're going to do, the money has to be transferred before the murder takes place? No. No, the money does not have to be transferred before. The crime is you use interstate commerce, you have the intent, and the agreement is that there will be money or something of value that happens. It doesn't matter when that happens. I'm just saying that the use of interstate commerce itself has to happen in a way that is with the intent. Weren't there a series of telephone conversations involving Rhodes before the murder, which conversations dropped off after the murder? Is that perhaps evidence from which you can infer that the murder was a subject of the conversations? You could infer that, or you can infer they're talking about dealing drugs. You can infer that they were buddies back in the day and, you know, Robinson had been gone a year. It's maybe for the jury to infer, right? And if that, if the instruction had been correct and the jury had convicted, we would have a different case. But the instruction allowed the jury to ignore the evidence that was so limited that it had resulted in a mistrial in the previous trial and gave them this hook to allow conviction based on the wire transfers. So, yes, they could have inferred that, but the jury instruction was wrong. If there was evidence from which the jury could infer from the instruction given that there was discussion over telephone involving the murder between Rhodes and Robinson or Marshall, and the instruction was an error, right? Wasn't the error harmless? The error is clearly not harmless because the only evidence we have of what was discussed in those calls is that there were calls, right? The only testimony that Marshall gave about the content of the calls is a call that was made afterwards where he said, you know, just let me get back to the South and I'll get you your money. And that happened afterwards. So we don't have content. We don't have cell phone location data. We don't have anything to support this idea that what they were talking about was the murder rather than getting drugs or how are you, buddy? It's been a long time since I saw you. Why'd you move to Louisiana? How much trouble are you in? We don't have evidence of what was the content of those calls. As I understand it, the crime is a murder, you know, with payment for money. Well, it doesn't have to be a murder, right? Because it can be. No, but that's the basis of what the crime is. The crime is clearly not murder. It's not a murder statute, right? It's an agreement. What was in play here? What was in play here?  Murder for hire. That's the name of the statute. Wasn't there a murder here? There was, but all that does is create life imprisonment as a punishment, right? The punishments are staggered, right? So if you agree to commit the murder and you use interstate commerce, but nothing happens, as is often the case, that's a crime, and it's the same crime, but you only get 10 years or up to 10 years. If you do it and someone's hurt, like you shoot them and you get them in the arm and they don't die, then I think it's 20 years, right? Only if there's an actual murder, death, someone dies, then you get the mandatory life in prison. But the – look, the statute, though, has two hooks. For hire, a murder or an agreement to murder, and payment, the hire, right? Why can't interstate commerce be used to complete the payment? The language of the statute has payment as the third element, and the first two elements clearly say you have to have the intent with. And this court has described that language in Driggers, Ritter, and Temkin as something that happens concurrently. So in Temkin, which is a 10-year-old case that Judge Wardlaw authored, the analysis included the fact that when there was this July 7th phone call when the defendant called the purported killer and said, please come to my state and murder my ex-wife, this court said that's enough for murder for hire because that phone call happened and that discussion happened on July 7th, and so now we're done. It doesn't matter whether a murder happened or not. Okay. I mean, I think this court has recognized at least the premise of my argument. And what I think, I'm not sure, I mean the government, I think what Judge Alsop was thinking was that somehow as long as my client later had the intent, this is the part I don't understand. But you're saying somehow whether he had the intent during when the interstate commerce facility was used doesn't matter. My understanding of the record was that there was an agreement, murder for hire, murder was completed, the payment was made after the murder, correct? That is the government's theory of the case, but the use of interstate commerce has to be with the intent. Well, they – Does it matter? I mean, yes. I mean, maybe they, let's suppose that they paid them, you know, right there, maybe he had $5,000 in cash, and then a day later the murder is completed and he just gives them $5,000. Right. Would that be a crime? Yes. If the court's premise is correct, it doesn't matter how the payment was made. No, but it does. Would that be a violation of this statute? As long as when the discussion to do the murder and the agreement to do the murder happened using a facility of interstate commerce, it doesn't matter how the payment was made as long as there was an agreement that there would be payment. The payment can be five years later as long as there was an agreement that there would be payment. So I think my point is this is an element of the offense. It's not the jurisdictional hook. If we were talking about just a jurisdictional hook, then maybe, you know, later interstate commerce transfers would matter, but we're not talking about that. We're talking about whether under the statute that the later interstate commerce, the later wire transfer, somehow can be converted into. . . It's evidence of a prior intent, isn't it? Sure, sure. There's some evidence of a prior intent. There also was. . . I mean, I think at the end of the day the question is whether the error was harmless. And so the question is not necessarily is there any way to look at this evidence to support the verdict. The question on de novo review is whether this jury instruction itself was a misstatement of the law. Ms. Ivins, you're saying as a matter of law, the language that a murder be committed necessarily requires the use of the interstate facility before the murder is committed. Because the language of the statute is the murder will happen later. Yes. Okay. Right. I mean, and the murder doesn't have to happen, right? It's the agreement that there will be a murder that has to happen. The murder does not have to happen. There can be any number of results that could happen, but it has to be used when you have the intent, which necessarily proceeds. And so I saw that Judge Alsup did say it doesn't matter whether the interstate commerce. . . Right. He. . . He didn't need to say that. He had already correctly instructed. I mean, if you look at also the other issues in the briefing, and I see I'm about to my two minutes for reserving for rebuttal. But if you look at the other issues, et cetera, I clearly, Judge Alsup was unhappy that there was a mistrial, and I think he was working very hard to have a better trial so that if there was going to be a conviction, there could be a conviction. And I understand that. But his addition of that language was legally incorrect. And I'd like to reserve the rest of my time for rebuttal. Good morning. May it please the Court, Annie Schaefer of the United States. Good morning. My friend on the other side focused on the statutory issue here. I'm going to turn to that first. It appears that Rhodes and the government agree on one thing, and that is the criminal intent here has to occur with the interstate activity. I think what we do disagree on is what that criminal intent entails, apparently. And the government's reading is that the intent here is that a murder for hire occur, that a murder for hire be committed. And I think that comports with the text of the statute. It comports with others and is supported by other canons of statutory interpretation, including the surrounding text, the legislative purpose and history, and the case law that has come out interpreting this particular statute. So I want to start with the text. And I know my colleague on the other side has already read it, but I want to focus on the language here, specifically with the intent clause. It says, with intent that a murder be committed in violation of the laws of any state or the United States as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value. And then there's a second clause there, or who conspires to do so. I think if we break down each of these parts of the text, I think it absolutely supports the government's reading here, which is that the intended crime is a murder for hire. And I think, Judge Pai, as your questions were going to that, I think we agree that a murder, if you're just intending a murder, it's not sufficient. But the intent here is that there's a murder being exchanged for something of pecuniary value. And so our reading of that language B, which I think is what Rhodes hangs his hat on, is that be committed is forward-looking. So his reading is essentially that a murder must be committed in the future. But our reading of it is that Congress did not intend for such narrow of an interpretation of this particular statute. Instead, if you look, to the extent that there's any ambiguity with this language, with the language be committed, which we read as connecting it to the consideration aspect, to the two conditions here, which is be committed in violation of a state or federal law, and it has to be committed as consideration for either receipt of something of value or consideration for a promise or agreement to pay. I think when you look at the statutory, when you look at the legislative history here, the Senate report from 1983 makes it very clear that the statute was meant to criminalize both the hit man and also the person who is soliciting or arranging for that murder for hire. Okay, so now relate that all to the evidence here. So with the evidence here, Your Honor, we have essentially a case where they're leading up to this murder for hire. We have a number of phone calls that were being made in the presence of Mr. Craig Marshall. There were text conversations and there were phone conversations. Those are shown by the phone records that were admitted at trial. It was also shown that with the cell phone location records that these cell phones were operating in the area leading up to where the murder occurred. And so you have quite a bit of evidence of essentially use of interstate facilities prior to the murder. What we have also is we have the evidence after the murder where this murder for hire was completed only once the payments were being made. Each of these wires after the murder for hire scheme was part and parcel to this intended murder for hire. And so every payment that was made was made with the requisite criminal intent. That is, and again, what the government did in this case was it did not have the cell phone records specifically. It did not have the content. Typically we don't get content without a wire or some other sort of surreptitious recording of phone calls. But the government put on Agent Heidelman in this case to explain why these were absent. It wasn't until about a year or a year and a half into the investigation that Rhodes was named as the hitman that Mario Robinson had hired. And he was named by Marshall. At that point, the investigators went to go look for the phone records, but they were no longer in existence or held by the company. And that was put forth before the jury as far as the absence of those records. But there's plenty of cases where we don't necessarily have content. And it's a reasonable inference for a jury to make that there is still a use of interstate facility, because there are certainly phone calls and texts between those two parties. And the timing of those calls, as they essentially increased up until the time of the murder and then dropped off significantly right after, also supports the inference here that Rhodes was guilty of this particular case. Your position is that there's evidence both before the murder and after the murder, which supports the instruction. Yes, Your Honor. That was presented at trial. I have a question that hasn't been brought up by Ms. Ivins. What was the evidence upon which Judge Alsop answered the question from the jury, no, as to Mr. Rhodes' involvement, other than as a trigger man? Yes, Your Honor. Because if there was no evidence of his involvement in the murder scheme other than as a trigger man, isn't it an error to instruct on that theory? No, not necessarily, Your Honor. The instruction here the district court made clear was not based on the evidence. It was to answer the jury's legal question. Yes, but the instruction was you may find him guilty if you find him to be, and the word was involved, involved. Now, what was the evidence of Rhodes' involvement other than as a trigger man? Well, his involvement was, again, Craig Marshall testified that in the two days preceding the murder, there were several conversations in which Rhodes agreed and said, I will do that for $5,000. He didn't have to be the hit man in that. He could have hired someone else to be the hit man. There was evidence before the jury that he actually already engaged in murder for hire by expressing, as long as there was a use of an interstate facility or some sort of— But then you have to prove that what acts of a hired hit man by Rhodes resulted, that was part of this instruction, resulted in the murder. Yes, Your Honor. So there was no evidence that he hired anybody else, right? No, Your Honor. The government's theory and the evidence here, as the factual narrative that was provided by Craig Marshall, which was the government's key witness, was that Rhodes was indeed the hit man. Marshall identified Rhodes as being there as an eyewitness. The jury asked, can we convict this defendant if he didn't pull the trigger, right? That was the question, yes, Your Honor. And the judge said, yes, you can, by his answer, if you find that he was involved. Now, my question to you is, what was the evidence of involvement other than being the trigger man? Well, Your Honor, I think the evidence is essentially this agreement, the conspiracy, the planning of the murder for hire. The conversations which occurred both over text and on the phone— But it's a conversation which is disconnected by any evidence from the actual murder. Yes, Your Honor, but I don't think as a matter of law that matters. Because the statute here, the crime of which he was charged, and the elements that were given to the jury, again, require only that a use of an interstate facility with a requisite murder for hire intent. And the statute is very clear that it is intended to criminalize both the hit man and the person who hires or arranges for a hit man, or is involved in that murder for hire scheme. So the jury was actually perplexed as to whether Rhodes actually pulled the trigger or not. So if he wasn't the hit man, what evidence was before the jury that he was involved? I think, Your Honor, the evidence of his involvement, again, comes from a lot of these same records that show that he agreed— You're saying it's the phone calls without content? Phone calls without content and Craig Marshall's testimony as to the conversations that they were having that day, both when he agreed in front of Marshall and said, yes, I'll take care of this for you for $5,000, essentially, is what he said. And then when they were at the liquor store right before they went to Apartment C and Robinson came back, Marshall was watching Robinson talk to Rhodes right outside the liquor store. Robinson came back to the car and told Marshall that Moe, which is Rhodes' nickname, is going to do it right here. And Marshall said in response, that's a terrible idea. This will come back to me because the rental car was in his girlfriend's name. So he watched Robinson go back to Rhodes, have some more discussion, and then they came back. And that's when Marshall said, OK, we're going to go to Apartment C. And that's when they drove to the crime scene. Ms. Shea, would you turn to ER 1048? At line 24, it's the instruction which the court gave the jury. And it was that the intended murder be committed in exchange for money and, fourth, that the death of Trince Thibodeau resulted. I take that to mean resulted from the use of interstate commerce. Now, my question to you is, what evidence was there that Rhodes' actions resulted in the death other than the fact that he was a trigger man? Well, Your Honor, I agree. You see the word resulted there? Yes, Your Honor. So that final element is a sentencing aggravator element. That final element is not required by the statute itself to violate the murder for hire offense. The death of Trince Thibodeau resulted is what triggers the mandatory life sentence. So that element is indeed required, but it's for a sentence aggravation here. OK, I got you. Counsel, so the conversations that they had in person, that's not interstate commerce, right? That's not wire or mail. No, it is not, Your Honor. The conversation that you're using to prove that he committed the murder. It's an inference. Yes, Your Honor. That wasn't over. Why isn't this a state murder? Your Honor, again, this is a federal murder because of the use of interstate wires here. And so the inference that the jury would have to make if Rhodes were, let's say, not the hitman here, and just the alternate theory that Rhodes perhaps arranged it, is the fact that he had these conversations both in person and there's proof that he was texting and calling Mario Robinson throughout the day and increasingly up to the time of the murder. And so the inference the jury would have to make, and I think this is a very reasonable inference here, is that these phone calls were indeed about planning this murder. They relocated in order to make this murder happen, and there were conversations both in person and over text that were occurring that Marshall observed during that time. Is that, let me ask you this, is that inference sufficient? Your Honor, I think the, so under an evidentiary sufficiency standard, absolutely. Reviewing, if it's evidentiary sufficiency, reviewing it in the light most favorable. We are looking at this, though, in terms of instructional error, and when it comes to instructional error, we're seeing whether it's clear beyond a reasonable doubt that the jury would have convicted without the absence of the error, essentially. So essentially, if the question is, if the challenge language here, if the district court said nothing about timing, and we just took out that last sentence about, you know, the interstate activity does not have to precede the murder, would that have made any difference? And I think based off the evidence here, it would not, because of the evidence that the government presented, of all the pre-murder wires that were crossing interstate lines. Let me ask you this. On the question that Judge Bea asked you about Judge Alsop's answer to the question, so his answer to the question when he said, he wrote back, no, oh, no, he brought the jury back into the courtroom, and then he answered that, no, you don't have to be the trigger man. So that's an instruction or a revision to the instruction. Do we review that modification for harmless error, correct? Yes, Your Honor. Well, first, I think you first review it for an abuse of discretion, I think, as far as giving the instruction and how the instruction is phrased. And then you look for harmlessness. Yes, Your Honor. Let's just assume it was error. His answer was erroneous. Yes, Your Honor. I don't actually think it goes to the elements here. I think this particular instruction didn't modify. It clarified, I think, the actual instructions that were given. I think when you look again, you look at the elements, and the elements required that interstate activity and the requisite criminal intent. And it encompasses different roles within this murder-for-hire scheme. And so I think that wasn't clear to the jury, possibly because of the evidence that was presented, the theories that were presented by both the government and the defense here that was argued was that the government said that Rhoades is a shooter in this case. The defense, its main argument was that Rhoades was not involved at all and attacked the lack of DNA on the shell casings and attacked several different aspects of Marshall's testimony and said he just wasn't even involved at all. I can't remember, but did they try to suggest that somebody else was the hit man? The defense did, yes, Your Honor. In the closing argument? Yes, Your Honor. So a lot of this was kind of, I think, invited. The defense said, look, obviously there's a murder. Obviously, I mean, we have pictures of someone who clearly died in public, and we see the video of it happening. We clearly see there was at least three people there. We see Marshall and Robinson running away from the scene and a shooter shooting into Thibodeau in a video. And so the defense theory that it continued to argue was Rhoades is, you know, he said the poor patsy that Marshall decided to blame a year and a half. That was the defense theory that they put forth there. And so, understandably, the jury was caught over this issue of, well, what happens if he's a shooter or not because we have all this other evidence. And I think it was, again, they asked this question, and it was very fair for the district court to carefully answer it and said under the law the answer is no, that anyone who's involved in this murder-for-hire scheme, as long as those four elements I instructed you are met. And, again, reiterated again and again, now this has nothing to do with what was presented here. It's up to you, jury, to decide whether the evidence has been met. It's the government's burden to prove that, but I'm just answering this as a matter of law. I think that was appropriate here. But when he says it has nothing to do with what was presented there, he's implying that there's evidence to show that Rhoades was, quote, involved, unquote. Otherwise he wouldn't be legitimate in giving the instruction. I probably paraphrased it, not very accurately, but I think his exact language was, under the law, all persons involved in a murder-for-hire scheme are guilty, so long as all of those elements, the four elements, are proven beyond a reasonable doubt. And then he says it's up to you to decide on the evidence before you whether or not those elements have been proven beyond a reasonable doubt, but at least this clarifies for you what the law is. And so, again, I think the way, again, we're looking at an abuse of discretion standard and we're looking at a judge who very carefully couched his instruction as just an answer to what he viewed as a legal question, and it was. And, again, it did refer the jury back to his instruction in the first place, which was legally correct as far as the elements that the government had to prove. And so to the extent that there was jury confusion, he again also reminded the jury that it's up to you to decide whether or not the evidence here actually meets the elements. And I think with regard to that supplemental instruction, I think the cases we have on, such as Gaskins and Fontenot, are instructive as far as the harmlessness here. One, I think the district court, unlike the court in Gaskins, did not introduce any new theory that lowered the government's burden. It did not introduce any new elements. The elements remain the same. And, indeed, the district court reminded the jury of that, that you need to go back to the elements that I read to you and that the burden is on the government. I think also when you look at when it comes to supplemental instruction and where the unfairness might result is if it essentially, I think, takes away from defense's opportunity to argue against or defend against essentially a new theory. That didn't happen here. Defense counsel argued vigorously in its closing, and the theory, the main theory that it proposed was that Rhodes was not involved at all. The government did not have a case at all that implicated Rhodes in any way and that essentially Rhodes was not there that day and it was someone else who was the hitman. Okay, let's see if my colleagues have any further questions. No. Okay. Thank you if there are no further questions. Thank you, counsel. We appreciate your arguments this morning. You can put three minutes on there. So we'll start with the last argument first. At ER 1047, right before the section that Judge Mayo was referring to, the conclusion of the government's argument was, and because the evidence has shown that it was the defendant who killed Trent Thibodeau in exchange for money, I'm asking you to deliver the only verdict that is supported by the evidence in this case, and that's the verdict that the defendant's guilty. So, I mean, just in terms of the analysis of whether what Judge Alsop did in answering that question, he definitely was going beyond what the theory of the case had been throughout the rest of the time. And, you know, I mean, I've argued that that is improper and it puts the thumb on the scale. As counsel just argued, though, didn't the defense in their closing argument stand up and say, it wasn't Rhodes who did this? Yes. He pointed his finger at somebody else. Didn't he suggest that Marshall did it? No, he suggested that Marshall implicated Rhodes because he wanted to find someone who seemed reasonable but wasn't the actual shooter. So I think that that was more the analysis of, like, he had to name someone, and there was actually some debate about whether that was a proper argument or an improper argument, but the idea was he had to name someone, and so he named this guy who he'd met while he was smoking dope with him in the neighbourhood and figured he was a good... You know, so that was the defense argument. Quickly, as to the first case, let me find Delpit. Here we go. So in Delpit, which is discussed, I think, in both of our briefs, there is very clear language that if you've got someone who comes in after the fact, like, even if they're involved, like, there were two, I think two of the co-defendants, like, got involved when everybody had flown in and they're going to do the murder and they're, like, showing the people, like, where the guys are hanging out, where the murder can take place. The court in the Eighth Circuit in Delpit basically said that's not good enough because it happened after the conversation that caused the travel. And so it does not matter that they got paid for doing that later. It doesn't matter that they were OK that there was going to be a murder. What matters is the first piece, which is the call or the, you know, whatever the interstate facility is that happens concurrent with or after this, you know, intent to commit the murder. So I think this court's ruling in Mr. Rhodes' favour is not much of a stretch based on this court's three prior published decisions, Ritter, Driggers, and Temkin. And I think that the judge adding that language just confused everything horribly and the evidence is just not sufficient. And even if it is sufficient, it was definitely not harmless. Thank you. Thank you, counsel. We appreciate your arguments this morning. And with that, we will submit the case and end our session, not only for today but for the week. Thank you very much. All rise. This court for this session stands adjourned.
judges: WARDLAW, PAEZ, BEA